## STATE OF CONNECTICUT *v.* ALPHA NIMS
(3329)

DUPONT, C. J., BORDEN and SPALLONE, Js.

Argued June 4—decision released August 26, 1986

*Beth A. Merkin,* with whom, on the brief, was *Thomas Corradino,* for the appellant (defendant).

*Robert J. Devlin, Jr.,* assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, and *Daniel A. Lyons, Jr.,* former assistant state's attorney, for the appellee (state).

SPALLONE, J. The defendant is appealing from the judgment rendered after he was convicted by a jury of one count of burglary in the first degree in violation of General Statutes §§ 53a-101 (a) (1) and 53a-101 (a) (2), two counts of attempted assault in the first degree in violation of General Statutes §§ 53a-59 (a) (1) and 53a-49, two counts of reckless endangerment in the first degree in violation of General Statutes § 53a-63, and one count of theft of a firearm in violation of General Statutes § 53a-212 (a).

The defendant claims that the trial court erred (1) in allowing into evidence the identification testimony of Carol Jerolman, (2) in allowing into evidence the identification testimony of Officer Duane McKay after refusing to afford the defendant an evidentiary hearing in connection with his motion to suppress McKay's testimony, and (3) in the manner in which it commented on the evidence.

The jury could reasonably have found the following facts. At approximately 10 p.m. on August 2, 1983, the defendant, Alpha Nims, and another individual, Jenny Newton, drove to Wilbert Street in Hamden. After driving past 27 Wilbert Street four times, they parked,

left the car, and walked into the rear of the residence of Sally Simonds at 12 Wilbert Street. George Jerolman witnessed the defendant and Newton enter the Simonds property. He stated that as the defendant and Newton entered the premises they were carrying what appeared to be plastic bags or pillow cases. Jerolman then called his mother, Carol Jerolman, who arrived on the scene accompanied by Mark Mazzone. Carol Jerolman and Mazzone went to the rear of the Simonds' residence. At this point, Newton came out of the back door and was grabbed and held by Mazzone, but he let her go to confront a man who dove out of a window of the Simond's residence. Mazzone described the man as being 5' 7'' or 5' 8'' tall, light skinned, with a small afro hair style, and deep cut facial lines. Mazzone also stated that the man wore no glasses, and no gloves. The man got away from Mazzone. Mazzone then went to the front of the house where he noticed a man on the left side of the house fire a shot into the air and two shots towards a group of people who had gathered in front of the house. Carol Jerolman ran from the Simonds' backyard to get additional help and, having concern for her son, ran toward him. While so engaged, her attention was drawn to a person coming from the side of the house near some bushes. Carol Jerolman shouted to a woman in the area to get back because of the gunfire. Because of her shouting, the man's attention was directed toward her, giving her an unobstructed view of his face which was illuminated by a nearby street light. Less than ten minutes later, Mazzone, who was walking further down Wilbert Street, saw the man with whom he previously had engaged in a struggle jump out of some bushes and fire shots at the police. Thereafter, at trial, although he was unable to make a positive identification of the defendant, Mazzone testified that the defendant's skin color and afro hair style were similar to those of the man with

whom he had struggled and who fired a weapon during the incident of August 2, 1983.

Officers Duane McKay and William Fry arrived on the scene in response to a report of a burglary in progress. As the officers approached the scene in their patrol car, they heard gunfire. When the police car turned into Wilbert Street, McKay saw, in the light of the vehicle's headlights, a black male and female. McKay got out of the patrol car and the black male continued to walk toward him and then fired at the officers from a distance of between twenty and twenty-five feet. The person who fired the shots ran off pursued by McKay into a backyard where, from a distance of fifteen feet, the man turned and again fired at McKay. The man jumped a fence causing McKay to lose sight of him although McKay again sighted the man from a distance of between fifteen and twenty yards running across Wilbert Street under a street light and then between two houses. The police then located the vehicle that had been driven to the scene by the defendant. In it they found a shotgun. The defendant's fingerprints were found on a soda can and a paper bag taken from the backseat of the car and on the hood of the car. On August 15, 1983, when he was arrested for the above crimes, the defendant stated to the arresting officer, "You have the wrong guy," and told the officer that his name was Walter Johnson.

At trial, Newton testified that she and the defendant were in the Simonds' house stealing items when they heard people approaching, at which time they fled. When Newton was grabbed by Mazzone, she saw the defendant fire a shot in her direction. She identified the pistol, found by the police in a field where the man who fired the shots was last seen, as belonging to the defendant. She also identified a shotgun as having been in the backseat of the defendant's car on the night of the incident, and identified the defendant as the per-

son who was with her, who engaged in the burglary and who fired the shots. In addition, she gave the police a picture of the defendant.

At the commencement of the defendant's trial, Carol Jerolman accompanied her son, George, to the courthouse where he was to be a witness for the state. Carol Jerolman looked into the courtroom and saw the defendant seated at a counsel table and immediately identified him as the black male who pursued her and apparently shot at her on the night of the incident. No law enforcement agent requested or encouraged her to look in the courtroom. Prior to her looking into the courtroom, she had not engaged in any identification procedures relative to this case. Further, she saw no photos of the defendant between the time she saw him in the courtroom and when she testified. During the jury trial, she made a positive in-court identification of the defendant as the person she had seen on the night of the burglary.

Officer McKay also made a positive in-court identification of the defendant as the person he observed on the night of the crime. McKay's first view of the defendant occurred as McKay arrived at the scene and observed Newton and the defendant walking toward him. He ordered them to stop and, at that time, the defendant fired a shot toward McKay. McKay saw the defendant again that night, both when the defendant was scaling a fence and when he ran across a street under a street light.

Shortly after the incident, McKay, having become aware that the defendant was a suspect, acquired a single photo of him and immediately recognized him as the person he had confronted and chased during the incident. Upon the defendant's arrest, McKay and other members of the Hamden police department went to New Haven to pick him up. Upon his arrival at the New

Haven police department, McKay saw the defendant seated in an office and he immediately recognized him as the person he had confronted and chased during the incident. The trial court refused the defendant's request to conduct a preliminary hearing regarding McKay's identification testimony. At the trial, McKay testified as to the circumstances of his out-of-court identification of the defendant. In addition, McKay made a positive in-court identification of the defendant.

The defendant's first claim is that the identification by Carol Jerolman of the defendant while he was seated in the courtroom was unnecessarily suggestive and, under the totality of the circumstances, unreliable. He contends that it was error for the trial court to have allowed this evidence and the subsequent in-court identification to come before the jury.

" 'A defendant who moves to suppress identification evidence bears the initial burden of proving that the identification resulted from an unconstitutional procedure.' " *State* v. *Evans,* 200 Conn. 350, 354, 511 A.2d 1006 (1986), quoting *State* v. *Fullwood,* 193 Conn. 238, 244, 476 A.2d 550 (1984); *State* v. *Elliott,* 8 Conn. App. 566, 569, 513 A.2d 1285 (1986); *State* v. *Wiggins,* 7 Conn. App. 95, 99, 507 A.2d 518 (1986). "In order to determine whether the identification procedures violated the defendant's due process rights, a case by case inquiry must be made as to (1) whether the identification procedures were unnecessarily suggestive, and, if so, (2) whether the identification was nevertheless reliable based upon an examination of the totality of the circumstances. *State* v. *Findlay,* 198 Conn. 328, 336-37, 502 A.2d 921 (1986); *State* v. *Amarillo,* 198 Conn. 285, 291, 503 A.2d 146 (1986); *State* v. *Perez,* 198 Conn. 68, 73, 502 A.2d 368 (1985)." *State* v. *Frazier,* 7 Conn. App. 27, 34, 507 A.2d 509 (1986).

We note that the defendant has made no showing that Carol Jerolman's viewing of the defendant while he was awaiting trial was prearranged or was in any way contrived by the police or the prosecuting authority. Absent an official procedure which is subject to the strictures of due process, the court was correct in concluding that Jerolman's in-court identification of the defendant was not tainted and that the defendant's due process rights were not violated by the admission of the evidence. *State* v. *Villafane,* 171 Conn. 644, 658, 372 A.2d 82 (1976), cert. denied, 429 U.S. 1106, 97 S. Ct. 1137, 51 L. Ed. 2d 558 (1977), overruled, in part, on other grounds, *State* v. *Stepney,* 191 Conn. 233, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984), reh. denied, 466 U.S. 954, 104 S. Ct. 2163, 80 L. Ed. 2d 547 (1984); *State* v. *Anderson,* 6 Conn. App. 15, 19–20, 502 A.2d 446 (1986).

The defendant's next claim challenges the trial court's ruling denying his motion to suppress McKay's identification testimony. Prior to the commencement of trial, the court held a hearing on the defendant's motion to suppress McKay's testimony concerning the identification of the defendant. The defendant argued that McKay's identification of him at the New Haven police station constituted a show-up, which was conducted in the absence of the requisite constitutional safeguards. The state argued that the events which surround McKay's viewing of the defendant did not constitute a police procedure which could be the subject of either an evidentiary hearing or a due process challenge.

On the basis of the representations of counsel during argument, the court concluded that McKay's out-of-court identification of the defendant did not result from an official proceeding and, therefore, an evidentiary hearing was not required. The defendant excepted

to the court's ruling. On appeal, the defendant claims that the court's denial of his request for a preliminary hearing and the resulting admission of McKay's testimony were erroneous. Our review of the transcript of the hearing on the defendant's motion to suppress indicates that there existed an issue of fact which was sufficiently in dispute so as to necessitate an evidentiary hearing on those issues; see *State* v. *Duffen,* 160 Conn. 77, 82, 273 A.2d 863 (1970), cert. denied, 402 U.S. 914, 91 S. Ct. 1397, 28 L. Ed. 2d 657 (1971); *State* v. *Oliver,* 160 Conn. 85, 90, 273 A.2d 867 (1970), cert. denied, 402 U.S. 946, 91 S. Ct. 1637, 29 L. Ed. 2d 115 (1971); LaFave, Search and Seizure § 11.2 (d) (1978); rather than the summary disposition afforded the issue at the suppression hearing.

Although we recognize that the proper procedure would have been to conduct an evidentiary hearing regarding the admissibility of McKay's identification testimony, we conclude that the court's failure to do so was harmless. See *State* v. *Shifflett,* 199 Conn. 718, 751–52, 508 A.2d 748 (1986); *State* v. *Felder,* 7 Conn. App. 489, 493–94, 509 A.2d 542 (1986). Therefore, we will assume, arguendo, that the identification of the defendant made by McKay was unnecessarily suggestive and, consequently, we will focus our analysis on whether, despite the suggestive factor present in the identification procedures, such identification was reliable under the totality of the circumstances. See *State* v. *Evans,* supra, 356; *State* v. *McKnight,* 191 Conn. 564, 569, 469 A.2d 397 (1983); *State* v. *Doolittle,* 189 Conn. 183, 190, 455 A.2d 843 (1983); *State* v. *Theriault,* 182 Conn. 366, 371–72, 438 A.2d 432 (1980); *State* v. *Frazier,* supra, 35; *State* v. *Nelson,* 4 Conn. App. 514, 517, 495 A.2d 298 (1985).

The factors to be considered in assessing the reliability of an identification include the opportunity of the witness to view the individual, the witness' degree of

attention, the prior description given by the witness, the time interval between the incident and the identification, and the witness' degree of certainty about the identification. *Manson* v. *Brathwaite,* 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *State* v. *Evans,* supra; *State* v. *Theriault,* supra; *State* v. *Frazier,* supra.

McKay's initial view of the suspect was at a distance of approximately forty feet and was illuminated by the headlights of McKay's police vehicle. The suspect walked toward McKay, consequently narrowing the distance between himself and McKay to approximately twenty or twenty-five feet. McKay's view was clear and unobstructed and lasted about one minute. McKay twice more viewed the suspect after their initial confrontation, once from approximately fifteen feet away and then from between fifteen and twenty yards. McKay described the suspect in detail as a light skinned, black male, five feet eight inches tall, weighing approximately 180 pounds, with a beard, and wearing a light colored open cotton shirt, a white workman's glove on his left hand and no glasses. McKay expressed complete confidence in his identification of the defendant as the suspect. The time interval between the incident and photographic identification of the defendant was a matter of a few days and was less than two weeks with respect to the in-person identification.

On the basis of the totality of the circumstances, we conclude that the trial court's conclusion that McKay's in-court identification of the defendant was sufficiently reliable to warrant its admission into evidence. It was then for the jury, after cross-examination, to determine what weight to give such evidence. *State* v. *Perez,* 198 Conn. 68, 76, 502 A.2d 368 (1985).

The defendant's final claim of error, challenging the trial court's comments on the evidence during its

charge to the jury, is without merit. Although the defendant in his brief launches a broad based attack on the court's comments on the evidence, we will limit our review only to those specifically raised by the exceptions taken to the charge. *State* v. *Kurvin,* 186 Conn. 555, 564, 442 A.2d 1327 (1982); *State* v. *Taxiltaridis,* 2 Conn. App. 617, 618, 481 A.2d 98 (1984).

After the court completed its instruction to the jury, the defendant took specific exceptions to the charge relating to (1) the court's comments on the evidence during its charge on accomplice testimony and the claimed corroboration by the state, (2) the court's comments on Newton's observation of a gun, (3) the court's use of the phrase "point blank" in the court's description of the shots fired at McKay, and (4) the court's failure to comment on the inability of a certain witness to identify the defendant.

General Statutes § 54-89 provides, in pertinent part, that the "court shall submit the facts to the jury without directing how to find their verdict." Within the parameters of this directive, the court is given certain latitude to comment on the evidence. It is well established that it is necessary for the court to allude to the evidence in order to furnish the jury with a practical guide as to how to apply the law to that evidence. *State* v. *Storlazzi,* 191 Conn. 453, 467, 464 A.2d 829 (1983); *Shea* v. *Tousignant,* 172 Conn. 54, 60, 372 A.2d 151 (1976). A trial court may comment on the weight of the evidence as long as it does not direct or advise the jury how to decide the matter. *State* v. *Mullings,* 166 Conn. 268, 274, 348 A.2d 645 (1974). "It has been established by repeated decisions in this State that a court, in submitting a case to the jury, may, at its discretion, call the attention of the jury to the evidence or lack of evidence, bearing upon any point of evidence in issue in the case, and may comment upon the weight of the evidence, so long as it does not direct or advise the jury

how to decide the matter." *State* v. *Cabaudo,* 83 Conn. 160, 163, 76 A. 42 (1910).

In *State* v. *Marx,* 78 Conn. 18, 28, 60 A. 690 (1905), the Supreme Court stated: "It is the duty of the trial judge, in submitting the law and the facts to the consideration of a jury, to refer to the testimony so far as may be necessary to assist the jury to a clear apprehension of the relation of the testimony, whose credibility they must determine, to the material facts they must decide . . . . It is evident that whenever this duty is well done, the charge must to some extent uncover the weakness of a weak case, the difficulties of a difficult case, or the strength of a strong case." Furthermore, "the fact that the claims or evidence of one party are stated at much greater length than those of the other does not by itself render the court's summary of the evidence in its charge unfair." *Anderson & McPadden, Inc.* v. *Tunucci,* 167 Conn. 584, 592, 356 A.2d 873 (1975); see *Sturdevant's Appeal from Probate,* 71 Conn. 392, 396, 42 A. 70 (1899).

We cannot examine any individual component of a charge out of context. It is well settled that charges must be considered in their entirety. *State* v. *Tomassi,* 137 Conn. 113, 124, 75 A.2d 67 (1950); *Kerin* v. *Baccei,* 125 Conn. 335, 337, 5 A.2d 876 (1939). Individual passages comprising the jury instructions must be construed in the light of the charge as a whole. *State* v. *Murphy,* 124 Conn. 554, 566, 1 A.2d 274 (1938); *Tappan* v. *Knox,* 115 Conn. 508, 511, 162 A. 7 (1932); *Smart* v. *Bissonette,* 106 Conn. 447, 453, 138 A. 365 (1927); *Salemme* v. *Mulloy,* 99 Conn. 474, 482, 121 A. 870 (1923); *State* v. *Griswold,* 73 Conn. 95, 100, 46 A. 829 (1900). We conclude that the charge, as a whole, fairly and correctly presented the case to the jury.

There is no error.

In this opinion the other judges concurred.