[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND IDENTIFICATIONS
The defendant, Isschar Howard, is charged with capital felony in violation of General Statutes § 53a-54b (8); two counts of murder in violation of General Statutes § 53a-54a (a); criminal possession of a firearm in violation of General Statutes § 53a-217 (a); carrying a pistol without a permit in violation of General Statutes § 29-35; and illegal possession of a narcotic substance in violation of General Statutes § 21a-279 (a). The defendant moves to suppress oral statements made to members of the New Haven Police Department as well as two separate identifications of the defendant made by an eyewitness. The defendant claims that his statements were made involuntarily and without knowledge of his rights under Miranda v. Arizona, 384 U.S. 436,86 S.Ct. 1602,16 L.Ed.2d 694 (1966), and that the eyewitness identifications were tainted by impermissibly suggestive police procedures. An evidentiary hearing was held before this court on October 2, 2002 and October 3, 2002, during which the court heard testimony from the following witnesses: Officer Robert Dudley of the New Haven Police Department; Detective Michael Hunter of the New Haven Police Department; and Dennis Robinson, the eyewitness.
 I
The court finds the following facts. On the evening of January 23, 2001, Dennis Robinson was leaning out of his fifth-floor apartment window at 1523 Chapel Street in New Haven, smoking a cigar. The window overlooked the snow-covered corner of Chapel Street and Winthrop Avenue. Shortly before 7:45 p. m., Robinson observed several young men conversing on the street corner below, including an individual wearing a black leather jacket, a shorter individual wearing a white and blue windbreaker, and two individuals known respectively to Robinson as "Ill" and "Sammy." Because it was his habit to smoke cigars while leaning outside that window and observing the happenings on the street below, Robinson recognized the man in the leather jacket and the shorter man as CT Page 12991 residents of the apartment building across the street, 300 Winthrop Avenue.
As Robinson watched, an argument ensued among the young men, apparently with regard to which of them was entitled to sell drugs on that particular street corner. At some point, Ill addressed the man in the leather jacket, saying, "I know you're not working." The man in the leather jacket answered, "Shit, yeah." A physical confrontation then erupted. The man in the leather-jacket and the shorter man broke out of the group and began running away, with Ill and Sammy following closely behind. As they were running, the man in the leather jacket turned to the shorter man and barked, "Give me that shit." The shorter man handed a gun to the man in the leather jacket, who then turned to face Ill. The shorter man kept running and was tackled by Sammy. After they hit the ground, the shorter man and Sammy turned to see the man in the leather jacket pointing the gun at Ill, who was saying, "Come on, bust me. Go ahead and bust me. If you're gonna bust me, then bust me." The man in the leather jacket then shot Ill. He then approached Sammy and the shorter man, who were still on the ground, and ordered Sammy to set the shorter man free. Sammy held his hands up. The man in the leather jacket pointed the gun at Sammy and shot him three times. The man in the leather jacket and the shorter man then ran inside the building at 300 Winthrop Avenue, with the man in the leather jacket in the lead. Ill and Sammy remained lying on the street.
Robinson then shouted to his girlfriend's mother, Debbie Scoff, who was in the apartment at the time, to call the police to report the shootings. Robinson remained at the window and watched as people began to assemble on the corner to assist the wounded men. Police cruisers also began to arrive on the scene.
Among the members of the New Haven Police Department to converge at the crime scene was Officer Robert Dudley, who had received a call from dispatch that a shooting had taken place at the corner of Chapel Street and Winthrop Avenue. At the scene, Dudley began applying crime scene tape to the area and then was met by Sergeant Minardi, who appeared to be supervising the crime scene. Minardi instructed Dudley to accompany him to the third floor of the apartment building at 300 Winthrop Avenue, apparently because Debbie Scoff had relayed to the police that Robinson had seen the perpetrators enter the building after the shootings. The officers stopped outside apartment 301, where they were met by Sergeant Taft. Dudley was instructed to remain outside while Minardi and Taft entered the apartment. Shortly thereafter, Minardi came to the door and asked Dudley to come inside. CT Page 12992
Dudley was told to enter the bedroom of the apartment, where he saw the defendant, dressed in a red, sleeveless Chicago Bulls basketball jersey. While Dudley stood by the defendant, Taft informed the defendant that they were going to bring him to the police station for questioning. Dudley told the defendant that he would put handcuffs on him, and the defendant turned and put his hands behind his back to allow Dudley to secure the restraints. As Dudley and the defendant started toward the door of the apartment, Dudley asked him whether he wanted to get a coat. The defendant responded that he did not have a coat, since he had just gone out to make a call. Then, gesturing toward his pocket, the defendant said to Dudley, "You might as well know I have drugs in my pocket." Dudley reached into the pocket the defendant was indicating and pulled out a plastic bag filled with sixteen smaller black plastic bags, each containing a white rock-like substance that Dudley later determined to be crack cocaine. Dudley placed the defendant under arrest for possession of narcotics, but did not give him the Miranda warnings. The officer then escorted the defendant out of the building and into a squad car parked nearby. It was now approximately 8:45 p.m.
Meanwhile, Robinson was still watching the scene from his apartment window. He saw police officers on the roof of 300 Winthrop Avenue, and then saw Dudley escorting the defendant out of the building and into a police cruiser. Robinson told Debbie Scoff to telephone the police dispatcher again to report that the man just escorted out of the building and now seated in the squad car was the shooter.
Shortly thereafter, Detective Michael Hunter of the New Haven Police Department arrived at Robinson's apartment building. Hunter had been advised that telephone calls to dispatch with information regarding the shootings had been placed from 1523 Chapel Street. Upon arriving at apartment 503, he found Robinson, Debbie Scoff, and Robinson's girlfriend, Lakea Scoff. Hunter then determined that Debbie Scoff had made the telephone calls to dispatch, but that Robinson was actually the primary witness. Hunter learned that Robinson had identified the shooter as the man who had been led out of 300 Winthrop Avenue.
Hunter then radioed to the officers on the scene that he was in the presence of an eyewitness to the shootings. The officers below took the defendant from the squad car and brought him to the steps in front of 300 Winthrop Avenue, where they positioned him upon the steps and facing across the street toward Robinson's building. An officer stood by the defendant. Robinson was not at the window at that time. Hunter then turned off the lights in Robinson's apartment and brought Robinson to the window. Robinson immediately identified the defendant, although now dressed differently, as the man in the black leather jacket who had shot CT Page 12993 Ill and Sammy.
The defendant was led back to the squad car and driven to the police station at One Union Avenue. After taking taped statements from Robinson and Lakea Scoff, Hunter met the defendant some time after 12:30 a.m. The defendant was brought to the interview room, where Hunter read him theMiranda warnings. The defendant indicated that he understood these rights and signed the department's standard Miranda waiver form, placing his initials after each of the warnings and his full signature at the bottom. The waiver form was witnessed by Hunter and another detective, Mahon. Hunter then asked the defendant whether he knew why he had been taken into custody. In response, the defendant admitted to shooting both victims, but indicated that he had only intended to shoot Ill in the legs because he thought Ill was carrying a gun. The defendant also admitted that the gun used in the murders was his, and that he had obtained the weapon during an earlier burglary. The defendant said nothing about his possession of the narcotics. Hunter then asked the defendant if he would repeat his statements on tape. The defendant refused and asked to speak to an attorney. At that point, the detectives' interrogation of the defendant was terminated.
 II
The defendant moves to suppress his statement to Dudley that there were drugs in his pocket, as well as his statement to Hunter wherein he confessed to the murders, on the ground that he uttered the statements without knowledge of his rights under Miranda v. Arizona, 384 U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The defendant also moves to suppress Robinson's initial identification to the police, dispatcher as the defendant was first being led out of 300 Winthrop Avenue, as well as Robinson's later identification to Hunter in the controlled viewing. The defendant claims that the first identification was the product of an impermissible show-up identification procedure, and that the second identification was consequently tainted by the impermissibly suggestive nature of the first procedure.
 A Statement to Officer Dudley
The defendant claims that his statement to Dudley regarding the narcotics "was neither voluntary nor given with knowledge of the Miranda
rights of the accused. . . ." (Defendant's Motion to Suppress, p. 1.) Specifically, the defendant claims that Dudley should have read him theMiranda warnings as soon as he was placed in handcuffs. CT Page 12994
"Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by Miranda: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation." (Internal quotation marks omitted.) State v.Tomasko, 238 Conn. 253, 267, 681 A.2d 922 (1996). "The defendant bears the burden of proving custodial interrogation." State v. Pinder,250 Conn. 385, 409, 736 A.2d 857 (1999).
"A person is in custody only if a reasonable person would have believed he was not free to leave." (Internal quotation marks omitted.) State v.Johnson, 241 Conn. 702, 719, 699 A.2d 57 (1997). It is undisputed that the defendant in the present case was in custody sufficient to satisfy the first threshold condition that triggers the constitutional requirement to give the Miranda warnings. At the suppression hearing, Dudley admitted on the witness stand that at the moment he put handcuffs on the defendant, the defendant was being "detained" and was not free to leave.
The defendant, however, has failed to meet his burden of proving the second threshold condition that must be satisfied for the Miranda
requirements to take effect. "[T]he Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term `interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . . A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." (Emphasis in original.) Rhode Islandv. Innis, 446 U.S. 291, 300-302, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); accord State v. Medina, 228 Conn. 281, 290, 636 A.2d 351 (1994). Moreover, "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. . . . `Interrogation,' as conceptualized in the Miranda opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself. . . . Voluntary statements of any kind are not barred by thefifth
amendment." (Citations omitted; internal quotation marks omitted.) Statev. Vitale, 197 Conn. 396, 412, 497 A.2d 956 (1985). CT Page 12995
In the present case, the defendant's declaration to Dudley that there were narcotics in his pocket came in response to Dudley's simple query whether the defendant wanted to put on a coat before going outdoors on that January night. Dudley had not asked the defendant whether he was carrying drugs; nor had Dudley done a "pat-down" search of the defendant for weapons or narcotics. At that time, the defendant was wearing a sleeveless basketball jersey that was repeatedly described at the suppression hearing as a "tank top." The events occurred during the middle of winter, and there was snow on the ground. Under these circumstances, it was entirely natural for Dudley to ask the defendant whether he wanted a coat, and Dudley could not reasonably have foreseen that this question would elicit an incriminating response from the defendant. Dudley cannot therefore be held accountable for failing to give the defendant the Miranda warnings at that time, because theMiranda safeguards had not been triggered.
Nevertheless, the defendant invites the court to find that Dudley was required to give him the Miranda warnings because Dudley took the defendant into custody for the express purpose of bringing him to One Union Avenue for interrogation. The defendant argues that, to give effect to the Miranda safeguards, the police must give the required warnings in a timely fashion. The defendant would have the court find that, where the purpose of taking a suspect into custody is to interrogate him, custody alone triggers the Miranda requirements. The defendant, however, has presented no evidence and can offer no case law from this jurisdiction or elsewhere to support his novel argument, and the court declines his invitation to depart from settled law. The defendant's motion to suppress is therefore denied with respect to his statement to Officer Dudley.
 B Statement to Detective Hunter
The defendant next claims that, like his statement to Dudley, his statement to Hunter "was neither voluntary nor given with knowledge of the Miranda rights of the accused. . . ." (Defendant's Motion, p. 1.) Specifically, the defendant contends that, because he was arrested for possession of narcotics and not for murder, he was so "shocked by the realization of the murder charge" that his statement to Hunter was not made voluntarily. The defendant asserts that he should have received theMiranda warnings twice — once upon being taken into custody for the narcotics offense, and once again upon learning that he was being arrested for the murders of Ill and Sammy.
Decisions from both Connecticut courts and the United States Supreme CT Page 12996 Court, however, do not support the defendant's claim. In State v.Hermann, 38 Conn. App. 56, 658 A.2d 148, cert. denied, 235 Conn. 903,665 A.2d 904 (1995), for example, the defendant was given the Miranda
warnings and questioned about an altercation he had had with his girlfriend. Id., 66. Without giving the warnings again, the police then proceeded to question the defendant about a sexual assault of the girlfriend's eight-year-old daughter. Id. The defendant made statements concerning both incidents. Id. The defendant claimed that, because he agreed to speak to the police on the assumption that he was being questioned about the argument with the victim's mother, he waived hisMiranda rights only with regard to the argument but had exercised his right with regard to the sexual assault. Id. After his motion to suppress his statements concerning the sexual assault was denied by the court, the defendant was convicted of the sexual assault. Id., 58-59. The Appellate Court upheld the conviction because "there is no requirement that the police inform an arrested person of the specific charges against him or her after they give the arrestee Miranda warnings. . . . Because Miranda
warnings were given and the defendant does not claim that his statement was coerced in any other way, he cannot prevail on this claim." (Citation omitted.) Id., 66; see also State v. Miller, 67 Conn. App. 544, 552-53,787 A.2d 639, cert. denied, 259 Conn. 923, 729 A.2d 855 (2002) (defendant could cite no case law to support the proposition that his Miranda waiver applied only to the crime for which he thought he was being questioned).
The United States Supreme Court had similarly held that "a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his [f]ifth [a]mendment privilege." Colorado v. Spring, 479 U.S. 564, 107S.Ct. 851, 93 L.Ed.2d 954
(1987). In Spring, the defendant was arrested on a firearms charge and given the Miranda warnings before being questioned on that charge. Id., 566-67. Without reiterating the warnings, the police questioned him as to whether he had ever shot anyone, and the defendant answered that he had shot his aunt as a juvenile and had "shot another guy once." Id., 567. After being convicted of murder, the defendant argued that his statement that he had "shot another guy once" should have been suppressed because he did not know he was being questioned about the murder and the statement was therefore compelled in derogation of his fifth amendment
rights. Id., 569.
After bluntly remarking that "Spring's argument strains the meaning of compulsion past the breaking point"; id., 573; the Supreme Court proceeded to explain that the relevant inquiry in a challenge to the sufficiency of Miranda warnings is not whether the suspect was aware "of all the possible subjects of questioning in advance of interrogation"; CT Page 12997 id., 577; but whether the decision to speak to the police was illegally compelled. "A statement is not `compelled' within the meaning of the [f]ifth [a]mendment if an individual voluntarily, knowingly and intelligently waives his constitutional privilege." (Internal quotation marks omitted.) Id., 573. Because the trial court had found the that the defendant had waived his rights knowingly, voluntarily and intelligently, his statement that he had "shot another guy once" could not have been illegally compelled. Id., 575.
The Supreme Court further held that the defendant's reliance on the statement in the Miranda decision that "any evidence that the accused was threatened, tricked, or cajoled into a waiver will . . . show that the defendant did not voluntarily waive his privilege" was also misplaced, and that the failure of the police to inform the defendant of all the potential subjects of interrogation did not rise to the level of aMiranda violation. (Internal quotation marks omitted.) Id., 575-76. "This Court has never held that mere silence by law enforcement officials as to the subject matter of an interrogation is `trickery' sufficient to invalidate a suspect's waiver of Miranda rights, and we expressly decline so to hold today." Id., 576.
The line of decisions discussed above demonstrates that Miranda
warnings apply even to alleged offenses about which a suspect has not been alerted. The present defendant's claim that he was shocked by the murder charge is thus not relevant to a determination whether his statement to Hunter was given under a valid waiver of his Miranda
rights. The relevant inquiries are rather (1) whether the defendant's decision to speak to Hunter was made knowingly, voluntarily and intelligently, and (2) whether Hunter or any other police engaged in any action that would amount to trickery sufficient to invalidate the defendant's waiver of the Miranda rights. The inquiry into whether the defendant waived his rights knowingly and intelligently involves whether, at the time of the questioning, the defendant "understood that he had the right to remain silent and that anything he said could be used as evidence against him." Colorado v. Spring, supra, 479 U.S. 574. The inquiry into whether the defendant waived his rights voluntarily "involves essentially whether the defendant's will was overborne by the police in eliciting the statement." State v. Piorkowski, 236 Conn. 388,404, 672 A.2d 921 (1996). The "trickery" inquiry involves whether the police engaged in actual, active deception deliberately designed to induce the defendant to confess to the murders; mere silence about the subject of the questioning on the part of the police is not enough. Colorado v.Spring, supra, 576.
The evidence adduced at the suppression hearing reveals to the court's CT Page 12998 satisfaction that the defendant's waiver of his Miranda rights was made knowingly, voluntarily and intelligently, and that Hunter and Mahon did not engage in any official trickery calculated to deceive the defendant into confessing to the murders. First, the defendant waived his rights knowingly and intelligently. Hunter read the defendant his Miranda rights before questioning him. The defendant indicated his understanding of these rights by initialing each of the Miranda warnings on the waiver form and signing the form at the bottom. The defendant has produced no evidence to suggest that he was under the influence of alcohol or drugs at the time or that he had less than a full understanding that he had the right to remain silent. Second, the defendant waived his rights voluntarily. His statement to Hunter came in immediate response to Hunter's initial query whether he knew why he had been taken to One Union Avenue. Again, the defendant has produced no evidence to show that Hunter, Mahon or any other members of the New Haven Police Department engaged in any activity to "overbear" his will. Third, Hunter and Mahon did not utilize active trickery designed to deceive the defendant about the subject of the questioning. The defendant confessed to the murders very shortly after being read the Miranda warnings and signing the waiver form. Hunter never told him that the rights that had been read to him were limited to the narcotics charge, and never even questioned the defendant about the narcotics.
The court thus finds that the defendant waived his Miranda rights knowingly, voluntarily and intelligently. The defendant's motion to suppress is therefore denied with respect to his statement to Detective Hunter.
 C First Identification
The defendant claims that Robinson's identification as the defendant was being led out of 300 Winthrop Avenue "was the product of an impermissible show-up identification procedure. . . ." (Defendant's Motion, p. 1.) Specifically, the defendant contends that once the police laid their hands upon him, they committed an impermissible state action that violated his due process rights under the fourteenth amendment of the federal constitution.
"[I]t is well established that conduct that may fairly be characterized as state action is a necessary predicate to a challenge under the due process clause of the fourteenth amendment to the United States constitution." State v. Holliman, 214 Conn. 38, 45, 570 A.2d 680 (1990). "If an identification of a defendant is done spontaneously and is not CT Page 12999 arranged by the police, the identification is not tainted by state action and due process rights are not violated." State v. Jones,59 Conn. App. 762, 766, 757 A.2d 689 (2000), cert. denied, 255 Conn. 924,767 A.2d 99 (2001). "A defendant who moves to suppress identification evidence bears the initial burden of proving that the identification resulted from an unconstitutional procedure." (Emphasis added; internal quotation marks omitted.) State v. Pollitt, 205 Conn. 132, 162,531 A.2d 125 (1987).
In State v. Jones, supra, 59 Conn. App. 762, the victim was beaten and robbed of his purse and his automobile after having picked up a prostitute. Id., 764. When the victim and a friend returned to the scene after reporting the incident to the police, the victim saw the prostitute and his car and again informed the police. Id. An officer then drove the victim back to the crime scene, where the prostitute directed the officer and the victim to a nearby location. Id. Upon arriving at the place where the prostitute had directed them, the victim saw his car, from which emerged the defendant. Id., 764-65. The victim then "blurted out that the defendant was the man who had robbed him." Id., 766. The defendant began to flee from the officer but was apprehended. Id., 765. A pat-down of the defendant and a search of the car produced the victim's wallet and purse. Id.
In his motion to suppress the victim's identification, the defendant claimed "that the victim did not identify him until the police brought the defendant to the police car that the victim was seated in and produced the victim's wallet from the defendant's pocket. The defendant [contended] that this was an unnecessarily suggestive one-on-one show-up and pat-down." Id. In upholding the trial court's denial of the motion, the Appellate Court determined that "there was no police conduct leading to the identification of the defendant. The victim pointed out the stolen car to the police and blurted out that the defendant was the man who had robbed him. Because the identification did not result from an official procedure subject to the strictures of due process, the [trial] court properly denied the motion to suppress the victim's identification of the defendant." Id., 766; see also State v. Watson, 50 Conn. App. 591, 602
(1998), appeal dismissed, 255 Conn. 953, 772 A.2d 153 (2001), cert.denied, 526 U.S. 1058, 119 S.Ct. 1373, 143 L.Ed.2d (1999) (sequence of events whereby police brought witness to a place where, unbeknownst to the police, the defendant happened to be "was not a `police procedure' at all").
In State v. Nims, 8 Conn. App. 631, 513 A.2d 1280 (1986), the defendant was seated at the counsel table awaiting the commencement of his trial. An eyewitness to the crimes of which the defendant was accused "looked CT Page 13000 into the courtroom and saw the defendant seated at a counsel table and immediately identified him as the black male who pursued her and apparently shot at her on the night of the incident. No law enforcement agent requested or encouraged her to look in the courtroom. Prior to her looking into the courtroom, she had not engaged in any identification procedures relative to this case. . . . During the jury trial, she made a positive in-court identification of the defendant as the person she had seen on the night of the burglary." Id., 635. The Appellate Court noted "that the defendant [had] made no showing that [the witness'] viewing of the defendant while he was awaiting trial was prearranged or was in any way contrived by the police or the prosecuting authority. Absent an official procedure which is subject to the strictures of due process, the [trial] court was correct in concluding that [the witness'] in-court identification of the defendant was not tainted and that the defendant's due process rights were not violated by the admission of the evidence." Id., 637.
In the present case, the eyewitness, Robinson, made his first identification without any prompting from the police. Robinson shouted to Debbie Scott to call the police dispatcher of his own accord as he saw the defendant being led out of 300 Winthrop Avenue. Robinson was not prompted in any way by the police to make this call, as there was not even a police presence in his apartment at the time. Notwithstanding the defendant's argument that the police committed a sufficient "state action" by putting their hands upon him and leading him to the squad car, the police in this instance carried out no "official procedure which is subject to the strictures of due process" in terms of Robinson's first identification. State v. Nims, supra, 8 Conn. App. 637. No law enforcement official directed Robinson to make this first identification. The defendant has failed to show that Robinson's first identification "was prearranged or was in any way contrived by the police or the prosecuting authority." Id. Absent any such showing, the defendant has failed to meet his "initial burden of proving that the identification resulted from an unconstitutional procedure." (Internal quotation marks omitted.) State v. Pollitt, supra, 205 Conn. 162. The defendant's motion to suppress is therefore denied with respect to Robinson's first identification.
 D Second Identification
The defendant's last claims pertain to Robinson's identification to Hunter in the controlled show-up. The defendant claims that this second identification "was consequently tainted by the impermissibly suggestive CT Page 13001 procedure of the first identification." (Defendant's Motion, p. 1.) The defendant also contends that the show-up was impermissibly suggestive and unreliable in that the "sins of memory" may have caused Robinson to substitute the defendant's image in his mind for that of another man. Because the court has already defined the first identification as the product of no state action; see part II C; the second identification could not therefore have been "consequently tainted" by the first. The court will thus proceed to discuss the defendant's claims of impermissible suggestiveness and unreliability, noting at the outset that the existence of state action is not disputed as to the second identification now in question.
"[T]he required inquiry [into whether an identification procedure is tainted] is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances." (Internal quotation marks omitted.) State v. Reid, 254 Conn. 540, 554, 757 A.2d 482 (2000). "The defendant bears the burden of proving both that the identification procedures were unnecessarily suggestive and that the resulting identification was unreliable." (Internal quotation marks omitted.) Statev. Ortiz, 252 Conn. 533, 553, 747 A.2d 487 (2000).
"An identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification." Id. In the present case, the state concedes that the show-up of the defendant to Robinson was suggestive. The defendant contends that the show-up was also unnecessary because the defendant was already under arrest. The state argues, however, that the show-up was necessary because of exigent circumstances. The court agrees with the state.
Our Supreme Court has recognized "that almost any one-to-one confrontation between a [witness] and a person whom the police present as a suspect is presumptively `suggestive,' but not all suggestive confrontations are unnecessary. . . . An immediate viewing of the suspect may be justified where it [is] important for the police to separate the prime suspect gold from the suspicious glitter, so as to enable them . . . to continue their investigation with a minimum of delay. . . . Circumstances may also justify an immediate viewing because prompt on-the-scene confrontations are generally more reliable and allow an innocent party to be released quickly if no positive identification is made." (Citations omitted; internal quotation marks omitted.) State v.Collette, 199 Conn. 308, 310, 507 A.2d 99 (1986). Identification CT Page 13002 procedures may therefore be justified by the exigencies of the situation and thus may not be unnecessarily suggestive. State v. Amarillo,198 Conn. 285, 293, 503 A.2d 146 (1986). When "faced with the question of whether an exigency existed, [the court must consider] such factors as whether the defendant was in custody, the availability of the [witness], the practicality of alternate procedures and the need of police to determine quickly if they are on the wrong trail." State v. Holliman, supra, 214 Conn. 48.
Here, the show-up, "although suggestive, was nonetheless not unnecessarily so, because the exigencies of the situation justified the procedure. . . ." (Emphasis in original; internal quotation marks omitted.) State v. Wooten, 227 Conn. 677, 686, 631 A.2d 231 (1993). In the present case, it true that the defendant was already in custody and that Robinson would probably have been available at a later time to make a second identification. Two victims, however, had been gunned down in short succession during the early evening hours in front of at least two large apartment buildings. Robinson saw the perpetrators run into one of the dwellings. It was imperative for the police to apprehend the perpetrator quickly, both for the safety of the inhabitants of those buildings and to ensure that the shooter did not escape. When the defendant was apprehended, it was crucial for the police to determine whether they had captured the right man, in order that they could quickly continue their investigation should they have been in error, and to avert the very "sins of memory" of which the defendant complains and to which Robinson might have been more susceptible should more time have elapsed between the crime and the identification. Under these circumstances, it would have been entirely impractical for Hunter and the other officers to take the time to gather together a lineup so that a one-on-one show-up could be avoided, and the defendant, while protesting that the show-up should have been circumvented, has failed to recommend any less suggestive procedure that the officers could have utilized.
"Even if [however] the identification procedure [was] unnecessarily suggestive . . . the identification may still be admitted if the totality of the circumstances is such that the identification was nevertheless reliable." State v. Reid, supra, 254 Conn. 556. "[R]eliability is the linchpin in determining the admissibility of identification testimony. . . ." Manson v. Brathwaite, 432 U.S. 98,114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). "To determine whether an identification that resulted from an unnecessarily suggestive procedure is reliable, [the court] must weigh the corrupting effect of the suggestive procedure in light of certain factors such as the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [that person's] prior description CT Page 13003 of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. . . ." (Internal quotation marks omitted.) State v. Figueroa, 235 Conn. 145,157, 665 A.2d 63 (1995).
Under these factors, Robinson's second identification was reliable. Robinson had a clear and unobstructed view of the entire incident from his fifth-floor perch. He knew the victims and was familiar with the defendant because it was his habit to look out of the same open window at the street corner below while smoking cigars. His degree of attention was so acute that he could not leave the window and had to shout to Debbie Scott to report the shooting. Robinson accurately noted that the perpetrator was wearing a black leather jacket at the time of the shooting and that the defendant was instead wearing a basketball jersey when he was led out of the 300 Winthrop Avenue. At the show-up, Robinson was so certain of what he saw that his identification of the defendant as the shooter was immediate. The show-up occurred on the same evening as the crime, at the same location.
The court thus finds that the show-up, although suggestive, was not unnecessarily so, and that, in any event, Robinson's second identification was reliable under the totality of the circumstances. The defendant's motion to suppress is therefore denied with regard to Robinson's second identification.
 III
For the foregoing reasons, the defendant's motion to suppress is denied.
___________________ HARPER, J CT Page 13004