STATE OF CONNECTICUT *v.* DOUGLAS WIGGINS
(4022)

DUPONT, C. J., DALY and BIELUCH, Js.

---

Argued February 18—decision released April 15, 1986

*Margaret P. Levy,* for the appellant (defendant).

*Christopher Malany,* deputy assistant state's attorney, with whom, on the brief, were *John Bailey,* state's attorney, and *Thomas Miano,* former assistant state's attorney, for the appellee (state).

DUPONT, C. J. After a trial to a jury, the defendant was convicted of robbery in the first degree in violation of General Statutes (Rev. to 1979) § 53a-134 (a) (2), and assault in the second degree in violation of General Statutes (Rev. to 1979) § 53a-60 (a) (2). The defendant appeals from the judgment rendered thereafter, claiming that the trial court erred: (1) in denying the defendant due process of law by allowing an in-court identification which was tainted by a prior impermissibly suggestive photographic identification; (2) in granting the state's motion for joinder and denying the defendant's motions for severance; and (3) in denying

the defendant the right to a trial by jury by failing to disqualify a juror for allegedly sleeping during the trial.

The jury could have reasonably found the following facts based upon the evidence presented. On November 22, 1980, Delroy Llewellyn was working alone as the night manager of a gasoline station located on Albany Avenue in Hartford. Llewellyn was carrying a gun and the station's cash receipts in his shirt pocket. At approximately 3:45 a.m., a male, whom Llewellyn recognized as having been at the gasoline station on previous occasions, came into the waiting room and asked Llewellyn for change for a dollar. As Llewellyn counted out the change, the man stepped behind him, drew a handgun and pinned Llewellyn's arms behind him. At this time, a second male, whom Llewellyn also recognized as a prior customer, entered the waiting room with a gun, raised it to Llewellyn's jaw, and fired. His jaw was shattered as a result of the gunshot. After the second male took Llewellyn's gun and the station's cash receipts, both perpetrators fled the scene with a third man who was outside of the waiting room. The victim later identified the second robber as the defendant in this case.

After being released from the hospital, Llewellyn went to police headquarters on November 25, 1980, to view a photographic array. At this time, the victim selected a photograph of the first perpetrator who had held Llewellyn while he was being shot. Subsequently, in May or June, 1981,[1] Llewellyn, by chance, saw the second perpetrator standing outside a building and was able to observe him in daylight for approximately one minute. Llewellyn reported this sighting to the police. The defendant later stipulated that his mother lived at the address where the victim saw the perpetrator, at the time the crimes were committed.

[1] The date of the sighting is uncertain. It may have been as early as the end of December, 1980, according to the police officer assigned to the case, or in May or June of 1981, according to the victim.

On May 11, 1982, Llewellyn selected a color photograph of the defendant from a stack of ten photographs given to him by a police officer investigating the case. After Llewellyn verified that the photograph pictured the assailant who shot him, the police officer showed Llewellyn a second photograph of the defendant, this time with a different facial expression, in order to confirm the victim's identification of his assailant. Llewellyn told the police officer that the second photograph pictured the same man he had previously identified as his assailant.[2]

At a hearing held prior to trial, the defendant moved to suppress the identification evidence in this case. In denying the motion, the trial court found that the photographic array shown to Llewellyn was not impermissibly suggestive and that, even if it were, the identification made by the victim was nevertheless reliable.

In a separate incident, the defendant was arrested on the evening of April 20, 1982, and charged with two counts of carrying a weapon in a motor vehicle in violation of General Statutes § 29-38. The defendant was one of five males arrested after a chase of their vehicle by police. A search of their car revealed one gun, which had been fired. Another loaded gun was found near the location where the car carrying the defendant was finally stopped.

On May 19, 1983, the state filed a motion for consolidation, pursuant to Practice Book § 829, requesting that the two cases involving the defendant be tried together. This motion was granted and the defendant's

---

[2] The original array shown to Llewellyn was not maintained intact. The police were able to reconstruct approximately seven of the ten photographs, including the original picture of the defendant. Prior to its loss, however, counsel for the defendant asked to view the original photo array shown to the victim. The array was shown to defense counsel, who took notes on the photographs.

motion to sever the cases was denied. The motion to sever was renewed at trial and was again denied by the court. At the conclusion of the trial, the jury returned a verdict of guilty to the charges of robbery in the first degree and assault in the second degree arising out of the robbery at the gasoline station in 1980, and a verdict of not guilty to the charges of carrying weapons in a motor vehicle arising out of the 1982 incident.

The defendant's first claim is that the trial court denied the defendant due process by allowing an in-court identification by the victim of the gasoline station robbery, an identification which the defendant alleges was tainted by a prior impermissibly suggestive photographic identification. It is well established that a defendant who attempts to suppress identification evidence has the burden of proving that the identification resulted from an unconstitutional procedure. See *State* v. *Aversa,* 197 Conn. 685, 693, 501 A.2d 370 (1985); *State* v. *Fullwood,* 193 Conn. 238, 244, 476 A.2d 550 (1984); *State* v. *McKnight,* 191 Conn. 564, 570, 469 A.2d 397 (1983); *State* v. *Frazier,* 7 Conn. App. 27, 34, 507 A.2d 509 (1986); *State* v. *Anderson,* 6 Conn. App. 15, 21 n.4, 502 A.2d 446 (1986). More specifically, our Supreme Court has repeatedly held that a conviction based on an in-court identification which follows an out-of-court photographic identification will be set aside only " 'if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' "*State* v. *Davis,* 198 Conn. 680, 684, 504 A.2d 1372 (1986), quoting *State* v. *Fullwood,* supra, 243–44; *State* v. *Parker,* 197 Conn. 595, 598, 500 A.2d 551 (1985); *State* v. *Vass,* 191 Conn. 604, 609, 469 A.2d 767 (1983); *State* v. *Doolittle,* 189 Conn. 183, 190, 455 A.2d 843 (1983); see also *Simmons* v. *United States,* 390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968).

In order to decide whether the identification procedures violated the defendant's right to due process, it must be determined (1) whether the identification procedures were impermissibly and unnecessarily suggestive, and, if so, (2) whether the identification was nevertheless reliable based upon an examination of the totality of the circumstances. See *State* v. *Findlay,* 198 Conn. 328, 336–37, 502 A.2d 921 (1986); *State* v. *Amarillo,* 198 Conn. 285, 291, 503 A.2d 146 (1986); *State* v. *Perez,* 198 Conn. 68, 73, 502 A.2d 368 (1985); *State* v. *Frazier,* supra, 34.

A review of the record in this case indicates that the identification procedures employed by the police were not so impermissibly suggestive as to constitute error. The defendant's claim that the failure to preserve the original photographic array intact makes it impossible to know whether the identification procedures were improperly suggestive is unpersuasive for several reasons. First, counsel for the defendant had the opportunity to view the complete photographic array and did take notes on it prior to its partial loss. Thus, the defendant had the opportunity to argue at trial that specific photographs seen by defense counsel were impermissibly suggestive, rather than claim on appeal that it was impossible to determine whether any of the photographs were impermissibly suggestive. Second, the failure to preserve the original photographic array does not preclude a finding that the identification procedures were not impermissibly suggestive. *State* v. *Miles,* 195 Conn. 552, 555, 489 A.2d 373 (1985); *State* v. *Doolittle,* supra, 199. The preservation of the array is not a condition precedent to an in-court identification. *State* v. *McKnight,* supra, 570 n.5.

The manner in which the victim was shown the photographs was not impermissibly suggestive. It is generally recognized that the presentation of several photographs, including that of the suspect, to a wit-

ness is by itself not impermissibly suggestive. *State* v. *Fullwood,* supra, 244–45. We conclude that the trial court was correct in denying the defendant's motion to suppress the identification evidence.[3]

The defendant's second claim is that the trial court erred in granting the state's motion for joinder and in denying the defendant's motions for severance. The decision of whether the cases should have been tried separately or together was within the discretion of the trial court and that decision cannot be disturbed unless the trial court manifestly abused its discretion. *State* v. *Rodgers,* 198 Conn. 53, 63, 502 A.2d 360 (1985); *State* v. *Bell,* 188 Conn. 406, 410–11, 450 A.2d 356 (1982); *State* v. *King,* 187 Conn. 292, 302, 445 A.2d 901 (1982); *State* v. *Frazier,* supra, 38.

The state presented its evidence to the jury in two separate segments, first introducing evidence as to the robbery and assault charges, and then introducing evidence as to the weapons charges. At the conclusion of the evidence as to the first incident, the court told the jury that the second phase of the trial was about to begin, that is, a consideration of the second incident. Thus, the possibility that the jury would be confused or that the jury would consider the evidence in a cumulative fashion was minimized. See *State* v. *King,* supra, 302; *State* v. *Frazier,* supra, 38. Furthermore, the trial court, in its charge to the jury, clearly instructed the jurors to consider each incident and each crime separately.[4] There is no indication that the jury was con-

---

[3] Even if we were to assume, arguendo, that the identification procedures in this case were impermissibly suggestive, the identification was nevertheless reliable under the totality of the circumstances. See *State* v. *Davis,* 198 Conn. 680, 683–84, 504 A.2d 1372 (1986); *State* v. *Perez,* 198 Conn. 68, 75, 502 A.2d 368 (1985). Here, the victim had the opportunity to view his assailant at very close range and in bright lighting. Furthermore, the victim demonstrated a high degree of attention while observing his assailant and exhibited a strong level of certainty regarding his identification.

[4] In its charge on this issue, the trial court instructed the jury as follows: "First, as you know, the accused in this case is being charged with four

fused by the presentation of the evidence or that the jury was unable to consider the evidence as to each incident separately and distinctly. *State* v. *Rodgers,* supra, 63; *State* v. *Bell,* supra, 411; *State* v. *King,* supra, 301–302. In fact, the jury returned a verdict of guilty as to the first incident, and a verdict of not guilty as to the second incident, negating any indication of confusion in its consideration of the combined charges.

The defendant's final claim is that the trial court denied the defendant his right to a jury trial by failing to disqualify a juror for allegedly sleeping through a portion of the trial. Both parties agree that the issue of discharging a juror who allegedly was sleeping during a portion of the trial is a question of first impression in this jurisdiction.[5]

A review of the decisions in other jurisdictions, both at the state and federal levels, indicates that the decision of whether a juror who may have been sleeping during part of a trial should be disqualified lies within the sound discretion of the trial court and that reversal is required only where that discretion has been clearly abused. See, e.g., *United States* v. *Key,* 717 F.2d 1206, 1209 (8th Cir. 1983); *United States* v. *Holder,* 652 F.2d 449, 451 (5th Cir. 1981); *United States* v. *Cameron,* 464 F.2d 333, 334–35 (3d Cir. 1972); *Hanes* v. *People,* 198 Colo. 31, 34, 598 P.2d 131 (1979); *State* v.

separate crimes alleged to have occurred during two separate incidents. In a robbery alleged to have occurred at Rupert's Exxon Station in November of 1980, Mr. Wiggins is charged with the crime of robbery in the first degree and assault in the second degree. In a separate and distinct incident, involving the arrest of a number of young men in a car on Barbour Street in the City of Hartford in April, 1982, Mr. Wiggins is charged with two separate violations of weapons in a motor vehicle. In considering the evidence and the testimony which he has presented, you must be certain to consider each separate incident and each separate crime charged."

[5] While the general qualifications of jurors are governed by General Statutes § 51-217, the specific issue of disqualification of a juror for sleeping during a trial is not addressed.

*Kimmel,* 202 Kan. 303, 305, 448 P.2d 19 (1968); *Commonwealth* v. *Jones,* 314 Pa. Super. 497, 499, 461 A.2d 267 (1983); *State* v. *Chestnut,* 643 S.W.2d 343, 346–47 (Tenn. Crim. App. 1982); *Zamora* v. *State,* 647 S.W.2d 90, 94 (Tex. Crim. App. 1983); see also note, "Inattention of Juror From Sleepiness or Other Cause as Ground for Reversal or New Trial," 88 A.L.R.2d 1275. Such a rule recognizes that the trial court is in the best position to evaluate and, if necessary, to resolve a claim of inattention or misconduct by a juror, without diminishing the requirement that a juror give the highest possible degree of attention to the proceedings in order to guarantee the defendant's right to a jury trial.

In this case, it was never conclusively established that the juror in question was actually asleep at any point in the trial. Differing opinions were offered by those present as to whether the juror was asleep and, if so, for how long.[6] Given this lack of conclusive evidence, the trial court, taking into consideration all of the cir-

---

[6] The initial discussion regarding the juror was as follows:

"The Court: Yesterday, the sheriff brought to my attention that he felt that the lady—the elderly lady who sat in the front row, was asleep. Now, I noticed her head down, but I have never been sure—I'm not quite sure as to whether the other day—we had a case here, and I was quite sure one of the jurors was asleep, and he wasn't. It was his way of listening, as it turned out, and he had his head down. Now, the sheriff had a feeling she was asleep. I noticed [defense counsel] nodding her head, as if she felt that she was asleep.

"[Defense Counsel] No. I directed—I'm nodding my head as to the fact that that's a problem. I frankly hadn't noticed it. My discussion with [the prosecutor]—he can speak for himself—was that neither of us—

"The Court: I don't think it's sure that she was asleep, and I don't think I'm in any position to do anything about it at this point, but I think we should all sort of observe it, and I think perhaps the best we all can do is to be sure she doesn't fall asleep at this stage. If anybody should see—if it should become obvious, then perhaps the Court could take some action, but I really don't know whether she was asleep or not. The Sheriff seemed to feel that she was. He was a little closer than I was. These things are difficult to be sure of, so let's be aware of that at this point."

cumstances, including the availability of only one alternate, the approach of a three day holiday weekend and the possibility that another juror might have to be replaced, was correct in denying the defendant's motion to disqualify. Furthermore, the trial court advised the jury as a whole to remain alert throughout the course of the trial, rather than take the irreversible, and perhaps premature, step of disqualifying the juror.[7] The defendant did not ask the court to examine the juror about her degree of attentiveness and failed to renew the motion to disqualify the juror after the conclusion of the three day hiatus, although the court had made it clear that it might take future action if necessary. The court, when ruling on the motion, stated that it was denying the defendant's motion "at this time," and that it did not believe "at this time" it needed to act.

At no time thereafter did the defendant voice concern about the juror's attentiveness. The alternate juror was still in attendance after the three day weekend and

---

[7] The trial court's remarks to the jury were as follows:

"The Court: Ladies and gentlemen, I'm just going to make a brief statement that might be of assistance to some of you. During the course of these trials, sometimes, of course, you're required to sit for rather lengthy periods of time, and occasionally some people become tired, and I've even heard of some people becoming sleepy. There's been a little fear spread with respect to this trial, that there are those among the jurors who have on occasion yesterday and again today, either fallen asleep or begun to fall asleep. It's extremely important, of course, that the jurors be fully aware of everything that goes on in the courtroom at all times. If the person should miss anything, it's not fair to the accused, it's not fair to the state, it's not fair to either party. I'm going to ask that you all cooperate with each other. If anybody feels sleepy, kindly, if necessary, ask for a recess. If anybody sees anybody who acts as if they are dozing, kindly have—help them out by giving them a little poke or something of that nature. Make it a cooperative effort. But please, don't anybody fall asleep or don't anybody come close to that. If there's anybody who feels that the situation is getting beyond their control, then of course you could let me know, and we would probably disqualify an individual, or excuse, rather, an individual.

"So, with this, ladies and gentlemen, I'm just asking that you all cooperate to keep each other alert and fully aware of all that's going on at all times."

the defendant could have renewed his motion. The defendant cannot, after his lullaby tune to the trial court—his failing to renew his motion to disqualify the juror—claim on appeal that the possible sleepiness of that juror denied him his right to a trial by jury. The court did not abuse its discretion under the circumstances.

There is no error.

In this opinion the other judges concurred.