## STATE OF CONNECTICUT *v.* GARY RYDER
### (AC 28448)

Gruendel, Beach and West, Js.

---

·

Argued September 18, 2008—officially released May 19, 2009

*Gary Ryder*, pro se, the appellant (defendant).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *Ricki Goldstein*, assistant state's attorney, for the appellee (state).

*Opinion*

GRUENDEL, J. We return to the case of the large reptile discovered by police in a Greenwich home. In an earlier decision by this court, *State* v. *Ryder*, 111

Conn. App. 271, 958 A.2d 797 (2008), we noted our inability to determine whether this court has subject matter jurisdiction over the present appeal and remanded the case for further fact-finding on that question. Now that the case has returned to us from the trial court, we conclude that we do have subject matter jurisdiction. Thus, the only remaining issue requiring our attention is whether the court properly denied the motions of the defendant, Gary Ryder, to suppress the evidence obtained as a result of the warrantless search of his home and to dismiss the case. We conclude that it did and, accordingly, affirm the judgment of the trial court.

The court found the following facts in its April, 2006 memorandum of decision disposing of the defendant's motions to suppress and to dismiss: "Officer Andrew Kelly has been a member of the Stamford police department for approximately seven and one-half years. On August 15, 2004, he was working the 4 p.m. to 12 a.m. shift. He was ordered out of his daily 'check out' at the beginning of his shift and told to report to dispatch. Officer Kelly testified that such a procedure was unusual and done only in cases of emergency situations, such as a motor vehicle accident.

"[Kelly] was informed that the dispatcher received numerous telephone calls from a father in Vermont, who was sounding increasingly frantic. The father informed the police that his two sons took the train to Greenwich for the weekend to visit friends, that they were supposed to return to Vermont by train at the conclusion of the weekend and failed to do so. The children had been missing for approximately twenty-four hours prior to the time the father called the police, during which time the father indicated that he was constantly trying to contact them. The father was finally able to contact one of his sons, who informed him that

the other son was at the defendant's house in Green-wich. Officer Kelly was told by the dispatcher that the Vermont father and the defendant previously had a relationship and resided together. Officer Kelly also learned from the dispatcher that officers from the prior shift that day went to the defendant's house, spoke with him about the Vermont father's claim that his child inexplicably failed to return to Vermont and informed him that the father believed that he was at the defendant's residence. The defendant directed the officers to another address where he stated the child was staying, which proved to be wrong information.

"Officer Kelly proceeded to the defendant's house . . . in Greenwich, which he described as an affluent area of town. He arrived at the house at [approximately] 4:30 p.m. and pulled into the beginning of the gated driveway, [the gate to which] was closed. He immediately noticed from that vantage point that there was a couch that was sticking partly out of the garage onto the driveway and a BMW convertible with its top down parked in the driveway.

"[Kelly], who was dressed in full uniform, used the intercom located at the driveway's entrance, but received no response. . . . [H]e stepped over the low white fence and began to walk around the house, announcing the presence of the police. Officer Kelly rang the front doorbell and knocked on the front door to no avail. He then walked around the back of the house and approached a set of French doors. He observed through those doors a cot on which there was a bag of clothes that appeared suitable for a teenager, some video games and an otherwise impeccable house. Officer Kelly grabbed the handle, realized that the door was not locked and proceeded to open the door. At that point, he called for backup in accordance with police procedure relative to finding an open door in a residence. Officer Robert Smurlo arrived at the scene

within a few minutes and was briefed by Officer Kelly before they entered the residence.

"Officer Kelly testified that based on the facts as he knew them to be, he believed that the missing child may be in danger inside the house. Important to that belief were the facts of a reportedly missing child, the nature of the couch and vehicle in the driveway area, no response to his repeated calls from outside the house, an unlocked door and the [child's] clothes strewn on the cot on the first floor. For those and other reasons, Officer Kelly decided to enter the residence along with Officer Smurlo to look in places where a child may be located.

"The officers searched the first floor of the house for the child and then proceeded upstairs. At one point, Officer Kelly went into a bathroom on the second floor and noticed what appeared to be a dark figure through the bathtub shower door. The glass was frosted. He testified that he believed the dark figure was the missing child. In this regard, he testified as follows: 'I slid the door open to the tub. To the greatest bit of relief, just a crocodile or a large lizard [was] in the tub.' Officer Kelly estimated that the reptile was six or seven feet in length.

"Officer Kelly closed the shower door, and he and officer Smurlo continued to search the rest of the residence for the child. Officer Kelly did not know at the time whether the possession of the reptile in the tub was illegal. The officers, having completed their search for the child, exited the residence and left the reptile still in the bathtub where they found it."

"On September 8, 2004, almost four weeks later, the defendant was arrested on charges of risk of injury to a child in violation of General Statutes § 53-21 and illegal possession of a reptile in violation of [General Statutes]

§ 26-55.[1] On March 6, 2006, the defendant moved to suppress the evidence obtained from the search of his home and to dismiss the charges against him. After a three day suppression hearing, the court denied the defendant's motions. The state entered a nolle prosequi with regard to the charge of risk of injury to a child, and the defendant entered a plea of nolo contendere to the possession of a reptile charge, conditioned on reserving his right to appeal from the court's ruling on his motions to suppress and to dismiss." *State* v. *Ryder*, supra, 111 Conn. App. 273–74. The court found that the rulings on the defendant's motion to dismiss and motion to suppress were dispositive of the case for the purposes of General Statutes § 54-94a and Practice Book § 61-6 (a) (2) (i)[2] and sentenced him to pay a $35 fine, which he since has paid.

"On appeal, the defendant contends that the warrantless search of his house violated his right to be free from unreasonable searches and seizures pursuant to the fourth and fourteenth amendments to the federal constitution and article first, § 7, of the Connecticut

[1] General Statutes § 26-55 provides in relevant part: "No person shall import or introduce into the state, or possess or liberate therein, any live fish, wild bird, wild mammal, reptile, amphibian or invertebrate unless such a person has obtained a permit therefor from the commissioner [of environmental protection]. Any person . . . who violates any provision of this section or any regulation issued by the commissioner as provided in this section shall be guilty of an infraction. . . ."

[2] Practice Book § 61-6 (a) (2) (i) provides in relevant part: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress or motion to dismiss, the defendant, after the imposition of sentence, may file an appeal within the time prescribed by law. The issue to be considered in such appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. . . . The court shall not accept a nolo contendere plea . . . where the denial of the motion to suppress or motion to dismiss would not be dispositive of the case in the trial court. . . ." The language of General Statutes § 54-94a is substantially similar to that of Practice Book § 61-6 (a) (2) (i).

constitution."[3] *State* v. *Ryder*, supra, 111 Conn. App. 274. In its appellate brief, the state did not address the defendant's claim but, rather, asserted that "this court lacks subject matter jurisdiction, arguing that payment of the defendant's fine prior to the hearing before this court rendered his appeal moot." Id.

We concluded, in the earlier opinion, that the defendant's appeal would indeed be moot unless he could demonstrate that payment of the fine was done involuntarily or that prejudicial collateral consequences were reasonably possible as a result of his conviction. Our rescript ordered the case remanded "for factual findings as to (1) whether facts came to light after the entry of judgment that would lead this court to conclude that there is a reasonable possibility that the defendant has suffered or will suffer prejudicial collateral consequences as a result of his conviction and (2) whether events occurred off the record that could lead this court to conclude that the payment of the fine was not done voluntarily by the defendant." Id., 277–78.

On remand, in a convincing and thorough discussion of the law concerning mootness as it relates to the present case, the court determined that (1) payment of the fine was done involuntarily and (2) there exists a reasonable possibility that prejudicial collateral consequences would occur as a result of the defendant's conviction. *State* v. *Ryder*, 51 Conn. Sup. 91, 976 A.2d 116 (2009). In light of the court's conclusion, the state has conceded, and we agree, that we do have jurisdiction over the present appeal.

We therefore turn to the question of whether the defendant's fourth amendment rights were violated by

---

[3] Although the defendant asserts that his rights under the Connecticut constitution also were violated, he has not provided an independent analysis of those rights. Therefore, we review only the federal constitutional claim. See *Watson* v. *Commissioner of Correction*, 111 Conn. App. 160, 165 n.1, 958 A.2d 782, cert. denied, 290 Conn. 901, 962 A.2d 128 (2008).

the warrantless search of his home. The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, *houses*, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (Emphasis added.) "[P]hysical entry of the home is the chief evil against which the wording of the [f]ourth [a]mendment is directed. . . . It is a basic principle of [f]ourth [a]mendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." (Citation omitted; internal quotation marks omitted.) *Payton* v. *New York*, 445 U.S. 573, 585–86, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980).

As our Supreme Court recently noted, "[o]ur cases consistently have held that both the state and federal constitution evince a preference for obtaining search warrants to protect the individual rights of our citizens. [I]t is a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions. . . . The requirement that a warrant be obtained before conducting a search reflects the sound policy judgment that, absent exceptional circumstances, the decision to invade the privacy of an individual's personal effects should be made by a neutral magistrate . . . . The point of the [f]ourth [a]mendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting

out crime." (Citations omitted; internal quotation marks omitted.) *State* v. *Edman*, 281 Conn. 444, 454, 915 A.2d 857 (2007), quoting *Mincey* v. *Arizona*, 437 U.S. 385, 390, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978), and *California* v. *Acevedo*, 500 U.S. 565, 586, 111 S. Ct. 1982, 114 L. Ed. 2d 619 (1991).

At trial, the prosecution argued that the warrantless search of the defendant's home did not violate the fourth amendment under the emergency doctrine exception to the warrant requirement. "The terms exigent circumstances and emergency doctrine are often used interchangeably when discussing warrantless entries into a home. The term exigent circumstances, however, generally refers to those situations in which law enforcement agents will be unable or unlikely to effectuate an arrest, search or seizure, for which probable cause exists, unless they act swiftly and, without seeking prior judicial authorization. . . . The emergency exception refers to another type of warrantless entry that evolves outside the context of a criminal investigation and does not involve probable cause as a prerequisite for the making of an arrest or the search for and seizure of evidence. . . .

"This second type of warrantless entry was recognized by the United States Supreme Court in *Mincey* v. *Arizona*, [supra] 437 U.S. 385 . . . and adopted by the Connecticut Supreme Court in *State* v. *Magnano*, 204 Conn. 259, 528 A.2d 760 (1987). In *Mincey* . . . the United States Supreme Court recognized the exigency or emergency exception to the warrant requirement. The court held that the fourth amendment does not bar police officers, when responding to emergencies, from making warrantless entries into premises and warrantless searches when they reasonably believe that a person within is in need of immediate aid. [*Mincey* v. *Arizona*, supra] 392–93. *State* v. *Magnano*, supra, 266. . . .

"Although it is desirable to encourage the police to make valid emergency entries into homes to protect lives, we cannot ignore the fourth amendment's protections against unreasonable searches and seizures. . . . Thus, the test to be employed . . . is whether, under the totality of the circumstances, a well-trained police officer reasonably would have believed that a warrantless entry was necessary to assist a person inside in need of immediate aid." (Citations omitted; internal quotation marks omitted.) *State* v. *Klauss*, 19 Conn. App. 296, 300–302, 562 A.2d 558 (1989).

"[G]iven the rationale for this very limited exception, the state actors making the search must have reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate that threat. . . . The police, in order to avail themselves of this exception must have valid reasons for the belief that an emergency exists, a belief that must be grounded in empirical facts rather than subjective feelings . . . . It is an objective and not a subjective test. The test is not whether the officers actually believed that an emergency existed, but whether a reasonable officer would have believed that such an emergency existed." (Citations omitted; internal quotation marks omitted.) *State* v. *Hoth*, 50 Conn. App. 77, 83–84, 718 A.2d 28, cert. denied, 247 Conn. 922, 722 A.2d 811 (1998).

To resolve this appeal, we look beyond the state's brief to the evidence that the trial court heard and the decision it made. "[I]n reviewing a trial court's ruling on the emergency doctrine, subordinate factual findings will not be disturbed unless clearly erroneous and the trial court's legal conclusion regarding the applicability of the emergency doctrine in light of these facts will be reviewed de novo. *State* v. *Geisler*, 222 Conn. 672, 694, 610 A.2d 1225 (1992). Conclusions drawn from the underlying facts must be legal and logical. Id., 693. We must determine, therefore, whether, on the facts found

by the trial court, the court properly concluded that it was objectively reasonable for the police to believe that an emergency situation existed. . . .

"As a prefatory matter, we note that the emergency doctrine is rooted in the community caretaking function of the police rather than its criminal investigatory function. We acknowledge that the community caretaking function of the police is a necessary one in our society. [I]t must be recognized that the emergency doctrine serves an exceedingly useful purpose. Without it, the police would be helpless to save life and property . . . . E. Mascolo, The Emergency Doctrine Exception to the Warrant Requirement Under the Fourth Amendment, 22 Buff. L. Rev. 419, 428 (1973). Constitutional guarantees of privacy and sanctions against their transgressions do not exist in a vacuum but must yield to paramount concerns for human life and the legitimate need of society to protect and preserve life . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Blades*, 225 Conn. 609, 617–19, 626 A.2d 273 (1993).

Our review of the facts found by the court[4] indicates that the facts known to Officer Kelly would lead a reasonable police officer to conclude that a minor was in

---

[4] We note that the defendant vehemently contests several of the factual findings made by the court. As noted previously, however, "factual findings will not be disturbed unless clearly erroneous . . . ." *State* v. *Geisler*, supra, 222 Conn. 694. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence . . . we give great deference to its findings. . . . As an appellate tribunal, this court may not retry a case. . . . The factfinding function is vested in the trial court with its unique opportunity to view the evidence . . . including its observations of the demeanor and conduct of the witnesses and parties, which is not fully reflected in the cold, printed record which is available to us. Appellate review of a factual finding, therefore, is limited both as a practical matter and as a matter of the fundamental difference between the role of the trial court and an appellate court. . . . Finally, we note that the trier

need of immediate aid. See *State* v. *Klauss*, supra, 19 Conn. App. 302. Given the frantic telephone calls by an apparently concerned parent, the suggestion, based on the presence of the car and couch in the driveway, that someone was in the defendant's home, the lack of an answer at the intercom and front door and the sight of a teen's belongings on the first floor, Kelly was justified in entering the house to determine whether the allegedly missing teen was in imminent danger and in need of assistance.

The defendant argues that facts have come to light since Officer Kelly's search that suggest that no minor was ever in any danger and that probable cause for a search did not exist. Neither of these assertions, even if true, would have any impact on our decision. The emergency doctrine does not involve a question of probable cause, and it is not dependent on the truth or completeness of the facts conveyed to the officer entering the premises. Id., 300. Rather, "[t]he reasonableness of a police officer's determination that an emergency exists is evaluated on the basis of the facts known *at the time of entry*." (Emphasis in original; internal quotation marks omitted.) *State* v. *Blades*, supra, 225 Conn. 619.

We hasten to add that "this limited privilege to investigate emergencies without a search warrant is subject to judicial scrutiny. . . . The reasonableness of police activity must always pass judicial muster according to objective, empirical criteria before the court." (Citation omitted.) *People* v. *Mitchell*, 39 N.Y.2d 173, 179, 347

---

of fact . . . is the sole arbiter of credibility, and thus is free to accept or reject, in whole or in part, the testimony offered by either party." (Citations omitted; internal quotation marks omitted.) *Somers* v. *Chan*, 110 Conn. App. 511, 530, 955 A.2d 667 (2008). Having reviewed the entire record, we conclude that the court's factual determinations find support in the record and that we are not left with the definite and firm conviction that a mistake has been committed. Consequently, we will not disturb these findings.

N.E.2d 607, 383 N.Y.S.2d 246 (cited with approval in *State* v. *Colon*, 272 Conn. 106, 143, 864 A.2d 666 [2004], cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 [2005]), cert. denied, 426 U.S. 953, 96 S. Ct. 3178, 49 L. Ed. 2d 1191 (1976). That being said, in light of the facts found by the court, we agree that, on the basis of what Officer Kelly knew at the time he entered the defendant's home, he had a reasonable belief that a minor was in imminent danger inside the house. As such, the entry was reasonable, and the defendant's fourth amendment rights were not violated.

The judgment is affirmed.

In this opinion the other judges concurred.