STATE OF CONNECTICUT *v.* RONNELL L. BANKS
(AC 28785)

Beach, Robinson and Mihalakos, Js.

Argued May 19—officially released September 15, 2009

*Heather M. Wood*, deputy assistant public defender, for the appellant (defendant).

*Timothy F. Costello*, deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Seth R. Garbarsky*, assistant state's attorney, for the appellee (state).

*Opinion*

BEACH, J. The defendant, Ronnell L. Banks, appeals from the judgment of conviction, rendered after a jury trial, of the crimes of sale of narcotics by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b) and interfering with an officer in violation of General Statutes § 53a-167a (a). On appeal, the defendant claims that the trial court (1) violated his sixth amendment right to confront witnesses by precluding him from admitting evidence showing motive, bias or

interest of a state's witness, (2) improperly dismissed a juror during trial and (3) improperly permitted a state's witness to testify as both a fact witness and an expert witness. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On July 12, 2006, at approximately 8 p.m., David Eldridge, a police officer assigned to the statewide narcotics task force, was working undercover as a drug buyer in the parking lot of a Shell gasoline station in Meriden. Eldridge was accompanied by a paid "confidential witness," Anthony Clark, who was also posing as a drug buyer. Eldridge and Clark were sitting in an unmarked Subaru that was outfitted with a device that transmitted an audio feed from within the Subaru to police officers in unmarked vehicles located across the street.

Clark made eye contact with the defendant, who asked him what he wanted. Clark responded that he was looking for a "$40 piece," indicating a certain quantity of drugs. The defendant told Clark to follow him to the intersection of Hobart and Myrtle Streets. The defendant then drove away from the gasoline station, with Eldridge and Clark following him, and drove toward the stated location. Eldridge and Clark parked the Subaru at the intersection of Hobart and Myrtle Streets, and the defendant drove past them and parked on Hobart Street. The defendant then left his car, and Eldridge and Clark lost sight of him. A few minutes later, the defendant emerged back into view and walked toward the intersection of Hobart and Myrtle Streets. He walked past the parked Subaru, scanned the area and then approached the passenger side widow, which was open. The defendant asked Eldridge and Clark what they were looking for, to which Eldridge responded, "two twenties," which in street vernacular meant 4.4 grams of crack cocaine or, in other words, two $20 bags of crack cocaine. The defendant pulled a plastic bag from his

pocket and allowed Clark to select two packets. Each of the packets contained a white rock like substance that, in Eldridge's training and experience, appeared to be crack cocaine. As the defendant handed the selected bags to Clark, Eldridge handed the defendant two $20 bills. The entire transaction lasted less than one minute.

Eldridge notified officers who were monitoring the transaction in unmarked vehicles, including a "raid van" and a minivan, that a drug sale had occurred and gave them a description of the defendant. As Eldridge and Clark left the scene in the Subaru, the other officers arrived. The defendant stepped in front of the minivan to cross the street and apparently noticed that the occupants seated inside the minivan were wearing clothing identifying them as state police officers. The defendant began to run down Hobart Street, and the officers ordered him to stop. The defendant disregarded this command and continued running. The officers chased the defendant for approximately one and one-half blocks. The officers briefly lost sight of the defendant but discovered him hiding by a bay window of a residence on Myrtle Street. The defendant engaged in a scuffle with the officers, but eventually the officers were able to handcuff him.

Following a jury trial, the defendant was convicted of sale of narcotics by a person who is not drug-dependent and interfering with an officer. The defendant was sentenced to ten years incarceration, execution suspended after seven years, with eighteen months probation. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly precluded him from cross-examining Clark regarding his motive, bias or interest in testifying and thereby violated the defendant's right to confront witnesses

against him as guaranteed by the sixth amendment to the United States constitution.[1] The defendant's claim is not properly preserved.[2] In the event that his claim was not properly preserved, the defendant seeks review under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[3] The record is adequate for review, and the claim is of constitutional magnitude. See *State* v. *Rolon*, 257 Conn. 156, 174–75, 777 A.2d 604 (2001) ("[i]t is well established that a defendant has the right to confront witnesses against him as guaranteed by the confrontation [clause] of . . . our federal . . . [constitution]").

[1] To the extent that the defendant also asserts a claim that his due process rights were violated under the Connecticut constitution, he has failed to provide an independent analysis of this issue under the state constitution. See *State* v. *Schultz*, 100 Conn. App. 709, 712 n.2, 921 A.2d 595, cert. denied, 282 Conn. 926, 926 A.2d 668 (2007); see also *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992) (providing analytical tools for state constitutional claims). Consequently, we deem the defendant to have abandoned any state constitutional claim as to this issue.

[2] The prosecutor's objection and the discussion that subsequently occurred as a result of that objection pertained to impeaching Clark's general character for credibility. The defendant did not object to the court's ruling on the ground that he wanted to inquire into Clark's pending charges for the purpose of exposing potential motive, interest or bias in testifying. "This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted." (Internal quotation marks omitted.) *State* v. *Johnson*, 289 Conn. 437, 460, 958 A.2d 713 (2008).

[3] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." *State* v. *Golding*, supra, 213 Conn. 239–40.

Although we conclude that the defendant's claim is reviewable under the first two prongs of *Golding,* the defendant's claim fails under the third prong of *Golding.*

The following additional facts are relevant to our resolution of this issue. During direct examination by the prosecutor, Eldridge testified that on the night in question he was working undercover with Clark. Eldridge described Clark as a "confidential witness" or a "concerned citizen" who received financial compensation from the state.

On cross-examination, defense counsel asked Eldridge if he knew whether Clark had any pending criminal charges. The prosecutor objected. After the jury was excused, the prosecutor stated: "My objection is twofold. One, the criminal conduct of any nature that is pending cannot be used . . . to impeach one witness. Secondly, if it was offered as impeachment evidence . . . [Clark] is not on the [witness] stand . . . ." The court then asked: "[D]o you have any objection to [defense counsel] asking whether or not [Clark] has any convictions?" The prosecutor responded: "Yes. I suppose that the purpose for that would be to impeach, I assume . . . ." Defense counsel clarified that he was concerned about "Eldridge's characterization of . . . Clark" as a concerned citizen. The court responded that "there is really no other way that you can characterize this other than impeachment; you are trying to impeach a person who isn't here, and he can't do that." Defense counsel asked for latitude in cross-examination of Eldridge to inquire into his description of Clark. The court stated: "Well I don't mind, if you ask him what are the factors or the personality traits of [Clark] that caused [Eldridge] to characterize him as a concerned citizen; that is fair game because [if] he is that concerned citizen, you are allowed to ask him that. Do you want to give me some other ideas of where you want to go with this so we don't have to excuse the jury again? I

mean, I have no problem with that. I think that it is pretty clear who he is and what he does." Defense counsel responded that the jury "won't know except for that he is a concerned citizen, but there is more to it than that." The court stated that the jury knows "that he is employed."

The prosecutor noted that "Clark will testify on behalf of the state and, in fact, he is our next witness. So, if [defense counsel] were going to ask those questions, I am also going to be objecting to him raising those to . . . Clark at the time that . . . Clark testifies. So, if you want to address that now, I think that is probably appropriate." The court responded that defense counsel had the right to ask Clark if he had any convictions that related to his credibility. The prosecutor began to comment on defense counsel's reference during Eldridge's testimony to pending charges, and the court stated: "Well, no, obviously he can't do that. He can examine this witness on anything that he said. He said that the man was a concerned citizen. I don't think that the jury was born yesterday; they know that this man is a paid informant, and that's how he makes his living. . . . You can explore that as far as you want, but as far as any character traits, I mean, this is where they are going to have to make their own . . . decision. But I can't let you, you know, again try to impeach, for lack of a better word, someone who isn't here or impugn his character."

Defense counsel then stated that he had a copy of Clark's criminal record, which included some pending cases. He asked whether he could examine Clark regarding the pending charges. The court responded: "No, only if he is convicted of a crime relating to veracity; isn't that still the law?" The prosecutor responded: "Is convicted of a felony within a ten year period. If it is beyond that, then perhaps if it goes to truth or veracity." The prosecutor noted that Clark's criminal record

reflected that he had no felonies. He further noted that Clark had a charge of larceny in the second degree that had been "subbed to a misdemeanor" and another misdemeanor larceny conviction that was "from over twenty years ago." After the prosecutor noted that convictions older than ten years generally could not be admitted to impeach credibility, the court ruled that Clark's criminal record was not admissible and asked defense counsel if he was satisfied with that ruling, to which defense counsel responded: "Yes, I am . . . ."

The defendant argues that his right to cross-examine Clark was unduly restricted because he was not permitted to question Clark regarding his pending criminal charges. The defendant argues that the pendency of criminal charges suggests that Clark may have been promised a favorable resolution of those charges in exchange for testimony leading to a conviction of the defendant and that such a promise would be highly probative evidence as to whether Clark had a motive to testify falsely.

"Although the trial court has broad discretion in determining the admissibility of evidence and the extent of cross-examination, the preclusion of sufficient inquiry into a particular matter tending to show motive, bias and interest may result in a violation of the constitutional requirements of the sixth amendment to the United States constitution. . . . The sixth amendment to the United States constitution guarantees the right of an accused in a criminal prosecution to confront and cross-examine the witnesses against him. . . . [Our Supreme Court has] held that [t]he primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Therefore, an accused's right to cross-examination to elicit facts tending to show motive, interest, bias and prejudice may not be unduly restricted

by the wide discretion of the trial court." (Citations omitted; internal quotation marks omitted.) *State* v. *Valentine*, 255 Conn. 61, 70, 762 A.2d 1278 (2000).

The defendant's claim fails under the third prong of *Golding* because the alleged constitutional violation did not clearly exist. The transcript does not show that the court restricted the defendant's ability to cross-examine Clark regarding any pending criminal charges *for the purpose of exploring any motive, interest or bias Clark may have had in testifying*. During cross-examination of *Eldridge*, the defendant sought to admit evidence of *Clark's* pending charges. The prosecutor objected, and the discussion the court had with both counsel following this objection pertained to whether defense counsel could use Clark's prior criminal record and current pending charges to impeach Clark's credibility. Although not specifically mentioned, § 6-7 of the Connecticut Code of Evidence[4] was quite clearly implicated in this discussion. During this discussion, defense counsel asked if the court would permit him to question Clark when he took the witness stand regarding his pending criminal charges. The court responded that defense counsel could do so only if the crime related to veracity. In the context of the prosecutor's objection and the discussion that followed, the court's ruling regarding defense counsel's ability to cross-examine Clark apparently affected only defense counsel's use of Clark's pending charges for the purpose of impeaching Clark's credibility pursuant to § 6-7. The defendant did not indicate to the court that he wanted to present evidence of Clark's pending charges for the purpose

---

[4] Section 6-7 (a) of the Connecticut Code of Evidence provides: "For the purpose of impeaching the credibility of a witness, evidence that a witness has been convicted of a crime is admissible if the crime was punishable by imprisonment for more than one year. In determining whether to admit evidence of a conviction, the court shall consider: (1) The extent of the prejudice likely to arise, (2) the significance of the particular crime in indicting untruthfulness, and (3) the remoteness in time of the conviction."

of revealing a possible motive, bias or interest in his testifying, and this issue was not before the court at the time of the challenged ruling.[5] The court was never expressly asked to rule on the use of pending charges to show motive, interest or bias. There was no specific ruling on this issue, and therefore we conclude that this claim fails under the third prong of *Golding* because the defendant has not shown that a constitutional violation clearly exists.[6]

## II

The defendant next claims that the court improperly dismissed a juror, H, during trial.[7] We disagree.

We first set forth our standard of review of a trial court's decision to remove a juror. "A court may excuse

[5] Defense counsel did not question Clark regarding his prior criminal convictions or pending charges. "Impeachment" can take many forms. The discussions in the trial court concerned "impeaching" credibility by evidence of criminal convictions. The court did not consider "impeachment" by showing an interest, bias or prejudice arising from the pendency of criminal charges.

[6] The defendant also seeks to prevail on his claim under the plain error doctrine. See Practice Book § 60-5. Because we see no basis on which the defendant may prevail under the plain error doctrine, we reject his plain error claim because we find no manifest injustice. *State* v. *Myers*, 290 Conn. 278, 289, 963 A.2d 11 (2009) ("[an appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both *so clear and so harmful that a failure to reverse the judgment would result in manifest injustice*" [internal quotation marks omitted]).

[7] We refer to the juror by initial to protect her legitimate privacy interests. See, e.g., *State* v. *Wright*, 86 Conn. App. 86, 88 n.3, 860 A.2d 278 (2004). The defendant notes in his brief that "although the record does not show" that the state sought H's removal because of her race or ethnicity, "that inference is certainly possible." There is nothing in the record to suggest that the state's actions were anything other than race neutral. The court's finding that H had trouble staying awake and did not hear all of the evidence provided cause for the court to remove H. See *State* v. *Diaz*, 94 Conn. App. 582, 588–89, 893 A.2d 495 (court did not abuse discretion in removing only Hispanic juror where record provided ample evidence showing court had cause to excuse jury because of juror's potential conflicts), cert. denied, 280 Conn. 901, 907 A.2d 91 (2006).

a regular juror if that juror, for any reason, becomes unable to perform his or her duty. General Statutes § 54-82h (c). The power to excuse a juror under this section is expressly premised on a finding of cause. . . . Whether in the circumstances just cause exists to excuse a juror is a matter within the discretion of the . . . court." (Internal quotation marks omitted.) *State* v. *Guzman*, 110 Conn. App. 263, 279, 955 A.2d 72 (2008), cert. denied, 290 Conn. 915, 965 A.2d 555 (2009). "[T]he decision of whether a juror who may have been sleeping during part of a trial should be disqualified lies within the sound discretion of the trial court and that reversal is required only where that discretion has been clearly abused. . . . Such a rule recognizes that the trial court is in the best position to evaluate and, if necessary, to resolve a claim of inattention or misconduct by a juror, without diminishing the requirement that a juror give the highest possible degree of attention to the proceedings in order to guarantee the defendant's right to a jury trial." (Citations omitted.) *State* v. *Wiggins*, 7 Conn. App. 95, 102–103, 507 A.2d 518 (1986).

The following additional facts are relevant to our resolution of this issue. On November 7, 2006, the court conducted a conference off the record and outside of the presence of the jury. The prosecutor subsequently stated on the record that it was brought to the state's attention that a juror may have been sleeping during portions of testimony. Defense counsel expressed concern about the situation. The court questioned whether it was possible that the juror was concentrating with her eyes closed.

On November 9, 2006, following the close of evidence, the court noted, outside of the presence of the jury, that early in the trial it had observed that a juror appeared to be sleeping and, at that point, requested an intern at the state's attorney's office who was sitting closest to that juror to kick the bench gently to keep the juror

awake. The court stated that "apparently the problem was not resolved. She continued in the opinion of everyone who observed her to be falling asleep." The court then conducted a hearing regarding H.

The court called two interns from the state's attorney's office, Amy Cullivan and Stephanie Panagiotou, as witnesses. Cullivan testified that H had been sleeping during trial. She further testified that on November 7, 2006, she observed H sleeping and attempted to wake H by kicking the bench, coughing and tapping on her watch, but that her efforts were successful "[s]ometimes, but not really." She testified that she was unable to observe H on the other days of the trial. Panagiotou testified that she observed H on November 7 and 9, 2006. She testified that on both days she noticed that H's head was down and eyes were closed and that H was "jolting up as if [H] was waking up quickly."

After hearing this testimony, and based on the court's observations, the court stated that "the body movements and the appearance that [H] had today during the arguments [were] the same as I had observed previously, and . . . I think the disinterested observer would say [H] has been sleeping a lot during this trial. . . . It is not fair . . . [to the defendant] to have a juror who didn't hear his defense, and I am here to tell you, that [H] didn't hear a heck of a lot during this trial." The court determined that H had to be excused but deferred removing her until after calling her to the witness stand to determine if she had an explanation. The court elected to do so after it delivered the jury instructions.

Following the jury instructions, the court remarked that H appeared more alert during the instructions than she had appeared during the entire trial. The court then called Cullivan and Panagiotou back to the witness

stand. Panagiotou testified that she did not see H sleeping during the instructions but that she had not been watching her very closely. Cullivan testified that she saw H sleeping during the instructions. She testified that H may have been asleep and that H's "head was bobbing" numerous times and that H was "in and out throughout." Cullivan testified that H would appear alert when the court looked at H, but the second the court looked away, H's head "went down."

The court then stated that "[i]t appeared to me at many times during the trial that [H] was sleeping." It also noted that a marshal brought it to the court's attention that H was "clearly sleeping." The court stated that H "never had any response" to Cullivan's efforts to wake her. The court did not "think that [H] heard the evidence."

H then testified that she had some difficulty staying awake but had nevertheless heard all of the evidence, arguments and instructions. H testified that she kept her eyes closed because the lights in the courtroom bothered her eyes. After H left the courtroom, the court noted that it had requested that the marshals turn off some of the lights in the courtroom because the lights bothered H's eyes and that the jury box was located in the darkest corner of the courtroom. The court concluded that H was frequently falling asleep and had not heard all of the evidence. The court did not think that H could be fair to the defendant. The court excused H. Defense counsel noted that although he respected the court's ruling, he had made his objections to such a ruling clear.

The defendant argues that the record does not support the court's finding that H was unable to perform the duty of a juror and that the court improperly failed to credit H's testimony that she had not been sleeping and had heard all of the evidence. We disagree.

The court did not abuse its discretion in excusing H for cause. There was evidence before the court that H

had been sleeping during trial and had not heard all of the evidence. Cullivan testified that she observed H sleeping on November 7, 2006, during trial and that her efforts to wake H were, for the most part, unsuccessful. Panagiotou testified that she observed H on November 7 and 9, 2006, and noticed that on those days H had her head down and eyes closed. The court did not find credible H's proffered excuse that the courtroom lights bothered her eyes. The court noted that H was in the dimmest portion of the courtroom. The court was not obligated to credit H's testimony. See *State* v. *Ryder*, 114 Conn. App. 528, 540, 969 A.2d 818, cert. granted on other grounds, 292 Conn. 919, 974 A.2d 723 (2009). The court concluded that H was "frequently falling asleep" and had not heard all of the evidence. The court was "afraid [that H] can not be fair to [the defendant]." We conclude that the court did not abuse its discretion in dismissing H for cause. The court made a sufficient inquiry into the situation and made a decision that was based on the ample evidence that was before it.

III

The defendant's final claim challenges the propriety of the court's ruling permitting Eldridge to testify as both a fact witness and an expert witness.[8] We are not persuaded.

"The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . The trial court has wide discretion in ruling on the qualification of expert witnesses and the admissibility of their opinions. . . . The court's decision is not to be disturbed unless [its] discretion has been abused, or the error is clear and involves

---

[8] The defendant frames his argument as presenting a constitutional issue, namely, a violation of due process. We decline to review the defendant's claim under a due process standard because the decision to admit expert testimony is not constitutional in nature in the context of this case. See *State* v. *Thomas*, 96 Conn. App. 578, 587, 901 A.2d 76, cert. denied, 280 Conn. 912, 908 A.2d 542 (2006).

a misconception of the law." (Internal quotation marks omitted.) *State* v. *Robles*, 103 Conn. App. 383, 401, 930 A.2d 27, cert. denied, 284 Conn. 928, 934 A.2d 244 (2007). "Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . . *State* v. *West*, 274 Conn. 605, 629, 877 A.2d 787, cert. denied, 546 U.S. 1049, 126 S. Ct. 775, 163 L. Ed. 2d 601 (2005) . . . . It is well settled that [t]he true test of the admissibility of [expert] testimony is not whether the subject matter is common or uncommon, or whether many persons or few have some knowledge of the matter; but it is whether the witnesses offered as experts have any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience any aid to the court or the jury in determining the questions at issue. . . . Implicit in this standard is the requirement . . . that the expert's knowledge or experience must be directly applicable to the matter specifically in issue." (Citations omitted; internal quotation marks omitted.) *Sullivan* v. *Metro-North Commuter Railroad Co.*, 292 Conn. 150, 158–59, 971 A.2d 676 (2009). "[T]he trial court's discretionary determination that the probative value of evidence is not outweighed by its prejudicial effect will not be disturbed on appeal unless a clear abuse of discretion is shown. . . . [B]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling. . . . Reversal is required only whe[n] an abuse of discretion is manifest or whe[n] injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Dehaney*, 261 Conn. 336, 358, 803 A.2d 267 (2002), cert. denied, 537 U.S. 1217, 123 S. Ct. 1318, 154 L. Ed. 2d 1070 (2003).

The following additional facts are relevant to our resolution of the defendant's claim. During direct exam-

ination, Eldridge testified that for the six years preceding trial, he had been a member of the statewide narcotics task force in Meriden. He detailed his training with respect to the "current trends" of drug dealing, which included knowledge of street level vocabulary. He noted how the language changes depending on geographic location; one might request 0.2 grams of cocaine by asking for "twenties" or "doves." He testified that he was familiar with how street level narcotics are packaged and distributed in New Haven County. After laying this foundation, the prosecutor asked that Eldridge be qualified as an expert in narcotics distribution in the area of New Haven County, to which defense counsel objected. The court then excused the jury. Defense counsel explained his objection and argued that certifying Eldridge as an expert would prejudice the defendant because the jury might give his factual testimony greater weight on account of his being qualified as an expert witness. The court rejected the defendant's claim of prejudice and stated that it would provide the jury with an instruction on expert witnesses. Further foundational evidence was presented through voir dire by both parties. The court then found that the prosecutor had established Eldridge to be an expert in local language involved in drug transactions and the manner in which narcotics were packaged in that area and certified him as an expert witness.

The defendant argues that Eldridge was necessary only as a fact witness because the case did not require expert testimony. The defendant stated in his brief that he does not claim that Eldridge was not qualified to testify as an expert in a case that required expert testimony and does not dispute that experts can testify in narcotics cases. He argues, however, that Eldridge did not have expert knowledge relevant to the evidence presented.

Our review of the record reveals that the court did not abuse its discretion in allowing Eldridge's expert

testimony. During voir dire, Eldridge, a member of the statewide narcotics task force in Meriden, detailed his specialized knowledge of street level vocabulary and familiarity with how street level narcotics are packaged and distributed in New Haven County. The court determined that Eldridge was an expert in those areas. Eldridge's knowledge of the common practices used by drug dealers in conducting transactions and the language used in such transactions demonstrated that he had special knowledge or experience, not common to the world, which was applicable to the matter at issue and would aid the jury in determining whether the defendant had engaged in the sale of narcotics.

The defendant also argues that the court improperly permitted Eldridge to testify as both a fact witness and an expert witness and that permitting him to testify as an expert added credibility to his factual testimony. Eldridge provided expert testimony and also testified as to what he personally observed on the night in question. "An expert witness with firsthand knowledge of the facts can always base an opinion on those facts. . . . [F]acts personally observed by an expert witness are not hearsay and may be used both for the basis of the expert's opinion and to prove the truth of the matter recited." C. Tait, Connecticut Evidence (3d Ed. 2001) § 7.9.2, p. 533. Contrary to the defendant's assertions, there is nothing other than speculation to suggest that Eldridge's opinion testimony prejudiced the jury by causing it to give Eldridge's factual testimony undue weight.[9] The court also evaluated the potential prejudicial effect of the testimony. The court did not agree

[9] It is not uncommon for a fact witness also to be an "expert" witness in many contexts, and we know of no prohibition of that practice. A court may consider using the term "opinion" testimony rather than "expert" testimony in order to avoid any claim that the court is bestowing its imprimatur on the testimony.

that the jury was likely to give Eldridge's fact testimony more weight because of his having testified as an expert. Additionally, the court instructed the jurors that they were the sole triers of fact and that no testimony was binding on them.[10] Absent evidence to the contrary, a jury is presumed to have followed the court's instructions. *State* v. *Fields*, 265 Conn. 184, 207, 827 A.2d 690 (2003). It was not an abuse of discretion for the court to permit Eldridge, who testified as to what he personally observed on the night in question, also to testify as an expert witness.[11]

The judgment is affirmed.

In this opinion the other judges concurred.

[10] In its instructions to the jury regarding expert witnesses, the court stated that "[a]n expert is permitted not only to testify to facts that they personally observed, but also to state their opinion about certain circumstances. . . . No such testimony is binding upon you, however, and you may disregard such testimony either in whole or in part. It is for you to consider the testimony with the other circumstances in the case and, using your best judgment, determine whether you will give any weight to it and, if so, what weight you will give to it. The testimony is entitled to such weight as you find the experts' qualifications in their field entitle it to receive, and it must be considered by you, but it is not controlling upon your judgment. An expert witness ordinarily may not express an opinion on an ultimate issue of fact, which must be decided by the trier of fact. The determination of the credibility of a witness is solely the function of you, the jury." The defendant makes no claim on appeal with respect to this instruction.

[11] The defendant also argues that the court improperly permitted Eldridge to testify concerning an ultimate issue of fact, namely, the identity of the defendant as the perpetrator. Although defense counsel objected to Eldridge testifying as an expert witness, counsel failed to make the claim that he now raises on appeal, namely, that Eldridge's testimony encompassed an ultimate issue of fact. Accordingly, the claim is unpreserved. See *State* v. *Johnson*, 289 Conn. 437, 461, 958 A.2d 713 (2008). The defendant requested *Golding* review and review under the plain error doctrine; see Practice Book § 60-5; in the event that his claim was unpreserved. Despite the fact that the defendant frames his third claim in terms of a deprivation of his due process right to a fair trial, his claim is evidentiary in nature. Because that claim is evidentiary in nature, it fails under the second prong of *Golding*. See *State* v. *Blango*, 103 Conn. App. 100, 117, 927 A.2d 964, cert. denied, 284 Conn. 919, 933 A.2d 721 (2007). We also conclude that plain error review is not warranted because the defendant has not demonstrated that he suffered manifest injustice. See *State* v. *Martinez*, 95 Conn. App. 162, 170 n.5, 896 A.2d 109, cert. denied, 279 Conn. 902, 901 A.2d 1224 (2006).